**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **JACKLINE SATTAM** | § | |
| **Plaintiff** | § | |
| | § | |
| **VS.** | § | |
| | § | **CIVIL NO. 5:25-cv-346** |
| **MACY'S RETAIL HOLDINGS, LLC,** | § | |
| **AND SCHINDLER ELEVATOR** | § | |
| **CORPORATION,** | § | |
| **Defendants.** | § | |

---

# PLAINTIFF'S SECOND AMENDED COMPLAINT

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES,** Plaintiff Jackline Sattam files this Second Amended Complaint against Defendants Macy's Retail Holdings, LLC and Schindler Elevator Corporation and alleges as follows:

## I. SUMMARY AND INTRODUCTION

1. This is a premises liability, negligence, negligent undertaking, and gross negligence action arising from a serious escalator incident that occurred on November 24, 2024, inside Macy's at North Star Mall in San Antonio, Texas.

2. Plaintiff Jackline Sattam, then approximately eighty years old, was lawfully using the up escalator from the second floor to the third floor when the escalator handrail moved at a substantially different speed than the escalator steps, causing Plaintiff to be jerked backward, lose her balance, fall, and be carried on the escalator. Plaintiff's spine was then grinded against the razor-sharp escalator steps for a period of time, before a customer finally lifted her up and carried her up the escalator.

3. Plaintiff alleges the dangerous condition was not sudden, isolated, or unforeseeable. Before Plaintiff's injury, the Subject Escalator had a recurring history of handrail-related and handrail-drive-related problems, repeated shutdowns, repeated repair activity, repeated return-to-service decisions, and repeated warning signs of chronic malfunction.

4. Plaintiff further alleges that Macy's, as owner and operator, and Schindler, as the entity that undertook to inspect, maintain, service, repair, and return the escalator to service, each knew or should have known the escalator posed an unreasonable and foreseeable risk of serious injury to riders, particularly elderly patrons.

## II.
## PARTIES

5. Plaintiff Jackline Sattam is an individual resident of Bexar County, Texas.

6. Defendant Macy's Retail Holdings, LLC ("Macy's) is a legal entity doing business in Texas and may be served through its registered agent or as otherwise provided by law. Defendant Macy's has filed an answer and a copy of this amended complaint is being served on its counsel of record.

7. Defendant Schindler Elevator Corporation is a legal entity doing business in Texas and may be served through its registered agent or as otherwise provided by law. Defendant Schindler has filed an answer and a copy of this amended complaint is being served on its counsel of record.

## III.
## JURISDICTION & VENUE.

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper in the Western District of Texas, San Antonio Division, under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Bexar County, Texas.

## IV.
## FACTUAL ALLEGATIONS

10. On November 24, 2024, Plaintiff Jackline Sattam, then approximately eighty years old, was lawfully on the premises of Macy's at North Star Mall in San Antonio, Texas as a customer and business invitee.

11. Plaintiff approached and boarded the Subject Escalator, traveling up from the second floor to the third floor inside Macy's. As Plaintiff rode the escalator, she placed her hand on the right-side handrail, as an ordinary customer would do. Macy's own signage directs customers to hold the handrail while using the escalator.

12. At that time, and unknown to Plaintiff, the handrail was moving at a substantially different speed than the escalator steps.

13. As a result of that speed mismatch, Plaintiff was jerked backward, lost her balance, and fell. Plaintiff landed on her back and was carried upward on the moving escalator steps, causing severe bodily injuries. Eventually, another customer lifted Plaintiff off the escalator and carried her to the top.

14. A Macy's employee was standing near the escalator when the incident occurred. As the incident unfolded, that employee searched for the emergency shutoff button but was unable to locate it. As a result, the Subject Escalator was not shut off until after Plaintiff had already been carried to the top by another customer and removed from the escalator.

15. Plaintiff would further show that Macy's employees documented on the date of the incident that Plaintiff was injured because the handrail was moving at a slower speed than the

escalator step. Macy's own employee's documented that the Subject Escalator was stopped because it presented a safety issue.

16. The dangerous condition that injured Plaintiff was not sudden, isolated, or unforeseeable. Before Plaintiff's injury, the Subject Escalator had a recurring history of handrail-related and handrail-drive-related complaints, service activity, shutdowns, repairs, and return-to-service decisions.

17. Before the incident, the Subject Escalator generated repeated reports and records reflecting, among other things, handrail-speed mismatch, handrail stoppage, handrail-drive trouble, unusual rail noise, repeated out-of-service periods, repeated repair activity, and repeated efforts to return the escalator to service.

18. Plaintiff would show that the same dangerous subsystem that injured her, namely the handrail and handrail-drive system, had been the subject of recurring problems for an extended period before November 24, 2024.

19. Plaintiff would further show that Defendants had repeated, escalating notice that the Subject Escalator's handrail system presented a serious and unresolved danger before Plaintiff was injured. In or around January 24, 2024, a Schindler technician recommended replacement of the entire right handrail. Plaintiff alleges the right handrail replacement was not completed prior to the incident.

20. Plaintiff would further show that, on or around June 5, 2024, another guest at Macy's nearly fell or was almost injured on the same escalator.

21. Plaintiff would further show that, in or around September 20, 2024, records further reflected a recommendation to replace both handrails on the Subject Escalator, including a capital-approval invoice or request for replacement of both handrails, yet that work was delayed into 2025.

22. Plaintiff would further show that, despite this escalating notice and the recommendation for full replacement-level corrective work, there is no reliable evidence that the dangerous handrail condition was durably corrected before the November 24, 2024 incident involving Plaintiff.

23. Plaintiff would further show that these events reflect repeated opportunities to correct the exact dangerous subsystem before Plaintiff was injured. Specifically, Defendants were not dealing with a hidden or sudden defect. Defendants were dealing with a recurring handrail danger that had already triggered technician replacement recommendations, near-injury warnings, and later full handrail replacement action, yet the escalator remained or returned to public use before Plaintiff's injury occurred.

24. Plaintiff would further show that the Subject Escalator was older equipment from the 1980s that required disciplined, recurring, skilled preventive maintenance, proper inspection, proper maintenance control, and safe return-to-service decision making to remain reasonably safe for public use.

25. Plaintiff would further show that, despite the escalator's age and recurring history, Defendants failed to maintain, control, and oversee the escalator in a reasonably safe manner.

26. Specifically, Defendants did not maintain any adequate Maintenance Control Program for this escalator and did not maintain any coherent, reliable, and centralized out-of-service and return-to-service history for the unit. Plaintiff alleges that Defendants lacked a real unit-specific maintenance control plan identifying required maintenance tasks, shutdown criteria, return-to-service criteria, recurring defect escalation procedures, or reliable maintenance history controls for this chronically malfunctioning escalator.

27. Plaintiff would further show that the absence of any meaningful maintenance control program on an old escalator with repeated handrail and handrail-drive problems reflects a dangerous failure of safety management, maintenance oversight, and risk control.

28. Plaintiff would further show that the lack of any real Maintenance Control Program made the Subject Escalator more dangerous because repeated defects were handled in a fragmented, ad hoc, and reactive manner rather than through a disciplined system of inspection, maintenance, escalation, shutdown, and safe return-to-service decision making. Plaintiff would further show that Defendants failed to maintenance the Subject Escalator in compliance with OEM specifications and standards.

29. Plaintiff would further show that, instead of a reliable and disciplined maintenance-control history, the records produced to date reflect a fragmented and contradictory service history, including conflicting logs, incomplete note histories, inconsistent work-order tracking, repeated repair entries, and incomplete or fractured records concerning the escalator's out-of-service dates and return-to-service dates.

30. Plaintiff would further show that Macy's maintained daily escalator inspection logs and other systems bearing on whether the escalator was safe for customer use. Macy's own November 2024 escalator inspection logs reveal the Subject Escalator was marked under "work order" status by Macy's staff the morning of November 24, 2024. Macy's own corporate representative testified that escalators marked under "work order" status should not be operating, confirming the Subject Escalator should not have been operating at the time of the incident.

31. Plaintiff would further show that Macy's own escalator inspection logs indicate the Subject Escalator was down or in work-order status for a substantial portion of 2024, including approximately more than 200 days. On information and belief, Macy's escalator inspection logs

reflect that the escalator was out of service or otherwise not safely available for customer use more often than it was safely and reliably in service during that year.

32. Plaintiff would further show that this extraordinary downtime should have marked the escalator as an obvious outlier and chronic problem unit requiring heightened scrutiny, durable corrective action, and strict return-to-service controls.

33. Plaintiff would further show that same-model sister escalators did not exhibit the same extreme persistent downtime pattern, further demonstrating that the Subject Escalator's dangerous condition was not merely the unavoidable consequence of age or model type. Instead, the prolonged and repeated downtime reflected a chronic unresolved unit-specific safety and maintenance problem that Defendants knew or should have known required stronger action than repeated patching, repeated service calls, or repeated return-to-service decisions.

34. Plaintiff further alleges that Schindler maintained service, maintenance, dispatch, and repair records bearing on the escalator's condition, recurring defects, repairs, and return-to-service decisions.

35. Plaintiff would further show that Macy's and Schindler each had access to, maintained, or participated in additional centralized and corporate-level systems and records reflecting work orders, notes, statuses, approvals, invoices, costs, centralized tracking, and communications concerning the Subject Escalator.

36. Plaintiff would further show that Defendants knew or should have known from their records, inspections, maintenance history, work orders, service notes, logs, centralized tracking, and communications that the Subject Escalator presented a recurring and unreasonable risk of serious injury to riders.

37. Plaintiff would further show that Defendants knew or should have known that an escalator handrail moving at a different speed than the steps created a foreseeable risk that a rider would be pulled off balance and fall.

38. Plaintiff would further show that the danger was especially serious for elderly patrons and other vulnerable invitees who would naturally rely on the handrail for balance and support.

39. Despite repeated notice and recurring defects, the escalator was repeatedly permitted to return to public use.

40. Plaintiff would further show that the same basic handrail-speed and handrail-drive hazard remained unresolved and was a producing and proximate cause of Plaintiff's injuries.

41. Plaintiff would further show that the records produced to date do not present a coherent or reliable account of the Subject Escalator's full out-of-service history, return-to-service history, work-note history, centralized tracking history, approval history, or cost history.

42. Plaintiff would further show that the Subject Escalator's annual inspection status was overdue or otherwise not current before the incident, that the escalator had repeated handrail-speed and handrail-drive defects before Plaintiff was injured, and that the escalator nevertheless remained or returned to public operation despite the absence of disciplined maintenance control, disciplined status tracking, and timely corrective action.

43. Plaintiff would further show that the contractual relationship, service structure, and approval structure governing the Subject Escalator created economic pressure and delay around major repair work affecting the very subsystem that later injured Plaintiff. Specifically, Defendants operated within a structure in which certain major handrail, handrail-drive, belt, chain, and related component work were economically sensitive, approval-sensitive, or routed into separate repair or

capital lanes. Meanwhile, smaller patch work, temporary adjustments, or repeated service activity continued in the meantime.

44. Plaintiff would further show that this structure created an incentive to keep the escalator operational, or repeatedly return it to service, without timely performing the durable corrective work necessary to eliminate the recurring danger.

45. Plaintiff would further show that the contractual and approval structure did not merely delay paperwork, but rather, foreseeably delayed and/or complicated vital repairs on a chronically problematic public escalator used by ordinary customers, including elderly patrons such as the Plaintiff. Plaintiff pleads these specific facts to show that Defendants had reason to favor temporary continuation, piecemeal repair, or delayed replacement over immediate durable correction, and that such conduct supports negligence, negligent undertaking, notice, conscious indifference, and gross negligence.

46. Plaintiff would further show that, despite recurring handrail-related defects, repeated out-of-service events, near-injury warnings, and an expired or non-current inspection status, Defendants failed to timely report or escalate the Subject Escalator's unsafe condition to the appropriate regulatory authorities to the extent required by applicable law and safety obligations. That failure further supports an inference that Defendants chose continued operation, delay, and fragmented internal handling over transparent safety compliance and public protection.

47. Collectively, Plaintiff pleads the facts above to show foreseeability, notice, control, failure to make the condition reasonably safe, failure to keep the escalator out of service when unsafe, negligent undertaking, and gross negligence.

48. Collectively, Plaintiff further pleads the facts above as evidence of Defendants' negligence, negligent undertaking, premises liability, notice, foreseeability, conscious indifference, gross negligence, and negligence per se to the extent permitted by law.

## V.
## CAUSES OF ACTION AGAINST DEFENDANT MACY'S RETAIL HOLDINGS, LLC.

### A. DEFENDANT MACY'S KNOWLEDGE, CONTROL, AND CONDUCT

49. At the time of the incident, Defendant Macy's and their agents, servants, and employees were guilty of negligence towards the Plaintiff in the following respects:

50. Macy's owned, operated, controlled, managed, possessed, and/or had the right to control the premises and the Subject Escalator.

51. Macy's owed Plaintiff, as an invitee, a duty to use ordinary care to reduce or eliminate unreasonable risks of harm created by dangerous conditions on the premises of which Macy's knew or should have known.

52. Macy's also owed duties arising from its operation of the store, its safety procedures, its inspection and logging practices, its ability to remove the escalator from service, its communication with Schindler, and its control over whether the escalator remained available for customer use.

53. Macy's knew or should have known of the escalator's recurring handrail-related and handrail-drive-related problems before Plaintiff was injured.

54. Macy's knew or should have known that an escalator handrail moving at a different speed than the steps created an unreasonable and foreseeable risk of serious fall injury.

55. Macy's knew or should have known that the danger was especially serious for elderly customers.

56. Macy's knew or should have known that Schindler's technicians recommended replacing the entire right handrail on or about January 24, 2024.

57. Macy's knew or should have known that a customer almost fell on the Subject Escalator due to similar issues in June 2024.

58. Based on Macy's own monthly escalator inspection logs, Macy's knew or should have known the Subject Escalator should not have been operating on the date of the incident.

59. Macy's knew or should have known the Subject Escalator's mandatory state inspection certificate was expired or otherwise not current at the time of the incident because Macy's maintained inspection logs, facilities records, corporate oversight personnel, and internal systems used to track escalator status, compliance, and safety issues. A reasonably prudent owner and operator of a public escalator used by customers, including elderly patrons, would know whether the escalator's required state inspection status was current before allowing continued public operation.

60. Despite this knowledge, Macy's nevertheless allowed the Subject Escalator to remain in or return to public use despite the expired or non-current inspection status, further supporting negligence, notice, foreseeability, and gross negligence.

61. Despite this knowledge, Macy's nevertheless failed to exercise ordinary care to make the escalator reasonably safe, to keep it out of service when unsafe, to warn invitees, and to protect Plaintiff from the unreasonable risk of harm.

**B. PREMISES LIABILITY AGAINST MACY'S**

62. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

63. Macy's had actual or constructive knowledge of a dangerous condition on the premises.

64. The dangerous condition posed an unreasonable risk of harm.

65. Macy's failed to exercise reasonable care to reduce or eliminate the risk.

66. Macy's failure proximately caused Plaintiff's injuries and damages.

67. Macy's was negligent in one or more of the following respects:

i. failing to inspect the Subject Escalator in a reasonably prudent manner;

ii. failing to monitor and act on recurring handrail and handrail-drive problems;

iii. failing to keep the escalator out of service when it was unsafe;

iv. failing to reconcile and act on its own safety logs, records, and work-order information;

v. failing to barricade, remove, or otherwise prevent customer use of the escalator;

vi. failing to warn Plaintiff and other invitees of the dangerous condition;

vii. failing to adequately train store employees and/or agents on proper emergency escalator shutdown procedure;

viii. failing to make the condition reasonably safe; and

ix. failing to timely escalate, approve, or require necessary corrective work for the Subject Escalator.

68. Macy's negligence and premises liability proximately caused Plaintiff's injuries and damages.

## C. NEGLIGENCE AND NEGLIGENCE UNDERTAKING AGAINST MACY'S

69. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

70. Macy's undertook to inspect, monitor, log, evaluate, communicate about, and determine whether the escalator was safe for customer use.

71. Macy's further undertook to coordinate repair requests, communicate with Schindler, maintain daily escalator inspection records, and control whether the escalator remained available to the public.

72. Having undertaken those functions, Macy's owed a duty to exercise reasonable care in carrying them out.

73. Macy's breached that duty by, among other things:

i. negligently inspecting or evaluating the escalator;

ii. negligently keeping or using escalator safety logs and records;

iii. negligently allowing the escalator to remain open or be returned to service;

iv. negligently coordinating or failing to coordinate necessary escalator safety action; and

v. negligently failing to act on recurring danger signals.

74. Macy's negligence and negligent undertaking proximately caused Plaintiff's injuries and damages.

**D. NEGLIGENCE PER SE AGAINST MACY'S**

75. Plaintiff incorporates the preceding paragraphs as if fully set forth herein

76. Plaintiff alleges, in the alternative, that Defendant Macy's violated applicable Texas statutes, regulations, administrative rules, safety requirements, and mandatory duties governing the lawful inspection, operation, maintenance, status, and public use of escalators, including duties concerning required inspection status, safe operation, and continued public use of escalator equipment. Such laws and regulations were enacted, at least in part, to protect members of the public, including business invitees such as Plaintiff, from the type of occurrence and injury that occurred here.

77. Macy's violations of such mandatory requirements constitute *negligence per se* to the extent permitted by Texas law, or alternatively constitute evidence of negligence, notice, foreseeability, breach of duty, and conscious indifference.

## VI.
## CAUSES OF ACTION AGAINST DEFENDANT SCHINDLER

### A. DEFENDANT SCHINDLER'S KNOWLEDGE, CONTROL, AND CONDUCT

78. At the time of the incident, Defendant and their agents, servants, and employees were negligent towards the Plaintiff in the following respects.

79. Schindler knew it undertook, for compensation, to inspect, maintain, service, diagnose, repair, adjust, and return the Subject Escalator to service.

80. Schindler possessed specialized knowledge concerning escalator safety, handrail synchronization, recurring mechanical defects, shutdown decisions, repair necessity, and return-to-service decisions.

81. Schindler knew that Macy's and the riding public relied on Schindler to exercise reasonable care in performing those functions.

82. Schindler knew or should have known of the escalator's recurring handrail-related and handrail-drive-related problems before Plaintiff was injured.

83. Schindler knew or should have known that an escalator handrail moving at a different speed than the steps created an unreasonable and foreseeable risk of serious fall injury.

84. Schindler knew or should have known the Subject Escalator's mandatory state inspection certificate was expired or otherwise not current at the time of the incident because Schindler was the specialized escalator contractor responsible for inspection-related, maintenance-related, service-related, and return-to-service-related functions for the unit. Schindler maintained or had access to service records, inspection-related communications, escalator status information, and other records bearing on whether the Subject Escalator was compliant and safe for continued public use.

85. Despite this knowledge, Schindler nevertheless failed to prevent continued public use

of the Subject Escalator, despite the expired or non-current inspection status, further supporting negligence, negligent undertaking, notice, foreseeability, and gross negligence.

86. Despite this knowledge, Schindler failed to exercise reasonable care in inspecting, maintaining, repairing, controlling, and returning the escalator to service.

87. Despite this knowledge, Schindler also failed to properly identify, correct, and control the recurring dangerous condition that injured Plaintiff prior to the incident.

## B. NEGLIGENCE AGAINST SCHINDLER

88. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

89. Schindler owed Plaintiff duties arising from ordinary care and from Schindler's role as the entity that undertook to inspect, service, maintain, repair, troubleshoot, and return the escalator to service.

90. Schindler breached those duties in one or more of the following respects:

i. failing to properly inspect the Subject Escalator;

ii. failing to perform adequate preventive maintenance;

iii. failing to perform maintenance and repair in accordance with ordinary care and applicable standards;

iv. failing to identify and correct the root cause of recurring handrail and handrail-drive defects;

v. failing to properly repair recurring defects;

vi. applying temporary, incomplete, or patch repairs in place of durable correction;

vii. failing to keep the escalator out of service when unsafe;

viii. failing to adequately warn Macy's of the recurring danger;

ix. returning the escalator to service when it remained unsafe;

x. failing to maintain accurate, complete, and reliable service and return-to-service records; and

xi. failing to use reasonable maintenance control and tracking for a chronic problem escalator.

91. Schindler's negligence proximately caused Plaintiff's injuries and damages.

**C. NEGLIGENT UNDERTAKING AGAINST SCHINDLER**

92. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

93. By contract and conduct, Schindler undertook to render services necessary for the protection of Macy's customers, including Plaintiff.

94. Those services included inspection, maintenance, servicing, troubleshooting, diagnosis, repair, adjustment, shutdown-related decision making, and return-to-service decision making for the Subject Escalator.

95. Schindler failed to exercise reasonable care in performing that undertaking.

96. Schindler's failures increased the risk of harm to Plaintiff and others similarly situated.

97. Macy's and the riding public relied on Schindler's undertaking and specialized knowledge.

98. Schindler's negligent undertaking proximately caused Plaintiff's injuries and damages.

**D. NEGLIGENCE PER SE AGAINST SCHINDLER**

99. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

100. Plaintiff alleges, in the alternative, that Defendant Schindler violated applicable Texas statutes, regulations, administrative rules, safety requirements, and mandatory duties

governing the lawful inspection, maintenance, servicing, repair, status, and safe operation of escalators, including duties concerning required inspection status, maintenance obligations, and safe public operation of escalator equipment. Such laws and regulations were enacted, at least in part, to protect members of the public, including Plaintiff, from the type of occurrence and injury that occurred here.

101. Schindler's violations of such mandatory requirements constitute negligence *per se* to the extent permitted by Texas law, or alternatively constitute evidence of negligence, negligent undertaking, foreseeability, notice, breach of duty, and conscious indifference.

## VII.
## GROSS NEGLIGENCE AND EXEMPLARY DAMAGES AGAINST BOTH DEFENDANTS

102. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

103. At the time of the occurrence, Defendants' acts and omissions, viewed objectively from their standpoint, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others. The Subject Escalator was a public-facing transportation device used by ordinary customers, including elderly patrons. A handrail moving at a different speed than the steps, a handrail not moving, a recurring handrail-drive malfunction, or repeated return-to-service of a chronically problematic escalator creates an extreme and foreseeable risk of serious bodily injury.

104. Defendants had actual, subjective awareness of that risk. Before Plaintiff's injury, Defendants had repeated notice of recurring handrail-related and handrail-drive-related problems, repeated service activity, repeated shutdowns, repeated return-to-service events, repeated indications that the escalator was not under safe control, and repeated facts showing the same dangerous subsystem remained unresolved. Defendants further knew or should have known that

this older escalator required disciplined, recurring, skilled maintenance and careful return-to-service decision making in order to remain reasonably safe for public use.

105. Despite that awareness, Defendants proceeded with conscious indifference to the rights, safety, and welfare of Plaintiff and others similarly situated. Among other things, Defendants failed to remove the escalator from service, failed to perform or require adequate preventive maintenance and durable root-cause repair, failed to timely implement or require necessary corrective or replacement-level work, failed to adequately warn of the danger, failed to maintain and reconcile reliable centralized records and maintenance history, and nevertheless allowed the escalator to remain or return to public use.

106. Plaintiff would further show that Defendants' conscious indifference is reflected by the recurring nature of the defect, the repeated opportunities to correct it before Plaintiff was injured, the repeated decision to return the escalator to service despite chronic problems, and the fractured, contradictory, and incomplete records concerning the escalator's maintenance history, shutdown history, return-to-service history, and centralized tracking. Defendants' conduct constituted a gross deviation from basic industry standards.

107. Plaintiff would further show that Defendants' conscious indifference is reflected by the absence of any real Maintenance Control Program for a chronically problematic older escalator, the lack of any coherent and reliable out-of-service and return-to-service history, the escalator's overdue or non-current annual inspection status, the repeated handrail-speed and handrail-drive defects preceding the incident, and the decision to continue or resume public operation despite those facts.

108. Plaintiff would further show Defendants had repeated, escalating warning signs before Plaintiff was injured. Specifically, a Schindler technician recommended replacement of the

entire right handrail in January 2024. Additionally, another Macy's guest nearly fell or was almost injured on the same escalator in June 2024.

109. By September 2024, records reflected replacement-level handrail work involving both handrails, yet the repair was delayed into 2025. Meanwhile, Macy's own escalator inspection logs indicate the escalator was down or in work-order status for a substantial portion of 2024, approximately more than 200 days. Macy's own logs indicate the Subject Escalator should not have been operating at the time of the incident.

110. Despite all of this, and despite the absence of any meaningful Maintenance Control Program for this chronically deficient escalator, Defendants still allowed the escalator to remain or return to public use before Plaintiff was injured. These facts support an inference of actual awareness of an extreme degree of risk and conscious indifference to the safety of escalator users, including Plaintiff.

111. Defendants' conduct was further ratified at the corporate level. Despite repeated reports, work orders, and documented escalator issues involving the same unit and specifically the handrail mechanism, Defendants through their managers, supervisors, and corporate representatives affirmatively approved, accepted, and continued the course of conduct that left the escalator in service without adequate repair or protection. This includes continuing to operate the escalator after prior complaints and known defects, failing to implement meaningful corrective measures, and allowing the condition to persist up to and including the date of Plaintiff's injury. By knowingly permitting the escalator to remain in operation under these circumstances, and by failing to intervene despite actual knowledge of the ongoing risk, Defendants ratified the underlying negligent acts and omissions, thereby adopting them as their own and elevating the conduct to gross negligence. See, e.g., repeated documented handrail failures, prior service calls,

and internal reports reflecting the same dangerous condition that ultimately caused Plaintiff's injuries.

112. As such, Plaintiff seeks exemplary damages as allowed by Texas law.

## VIII.
## DAMAGES

113. As a direct result of the conduct of Defendant and their agents, servants, and employees, Plaintiff suffered severe injuries to her body, more specifically to her head, back, shoulder, brain, and/or legs. These injuries are permanent in nature. The injuries have had a serious effect on Plaintiff's health and well-being. Some of the effects are permanent and will abide with Plaintiff for a long time into the future, if not for her entire life.

114. These specific injuries and their ill effects have, in turn, caused Plaintiff's physical and mental condition to deteriorate generally and the specific injuries and ill effects have caused and will, in all reasonable probability, cause Plaintiff to suffer consequences and ill effects of the deterioration of her body for long into the future if not for the balance of her natural life. Plaintiff contends her injuries have caused a loss of independence.

115. As a result of the nature and consequences of her injuries, Plaintiff has suffered great physical and mental pain, suffering and anguish and in all reasonable probability, will continue to suffer in this manner for a long time into the future, if not for the balance of her natural life. By reason of all the above Plaintiff has suffered losses and damages in a sum within the jurisdictional limits of this Court and for which this lawsuit is brought.

116. As a further result of all of the above, Plaintiff has incurred expenses for her medical care and attention. These expenses were incurred for the necessary care and treatment of injuries resulting from the incident. The charges are reasonable and were the usual and customary charges made for the services.

117. As a further result of the injuries sustained by Plaintiff, there is reasonable probability that she will require further medical care and attention and will incur future reasonable and necessary expenses for her medical care and attention.

118. Plaintiff further alleges she has lost the power to move from place to place. In all reasonable probability, this disability will cause her to suffer long into the future, if not for the balance of her natural life.

119. Plaintiff seeks all actual damages recoverable under Texas law.

## IX.
## INTEREST

120. Plaintiff further requests both pre-judgment and post-judgment interest on all damages as allowed by law.

## X.
## DEMAND FOR JURY TRIAL

121. Plaintiff respectfully requests and demands a trial by jury. The appropriate jury fee was tendered with Plaintiff's Original Petition.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff requests that the Defendants be cited to appear and answer, and on final trial hereafter, the Plaintiff has judgment against Defendants, jointly and severally, in an amount within the jurisdictional limits of this Court, for Plaintiff's actual damages, statutory damages, pre judgment and post judgment interest as allowed by law, costs of Court, and such other and further relief to which Plaintiff may be justly entitled by law and equity, including but not limited to:

1. Pain and suffering in the past;
2. Pain and suffering in the future;
3. Mental anguish in the past;
4. Mental anguish in the future;

5. Past medical expenses;
6. Future medical expenses;
7. Physical impairment in the past;
8. Physical impairment in the future;
9. Physical disfigurement in the past;
10. Physical disfigurement in the future;
11. Pre-judgment interest;
12. Post-judgment interest; and
13. Exemplary damages.

Respectfully submitted,

/s/ Phillip Ripper

Phillip Ripper
State Bar No. 24085866
Email: phillip@ripper-law.com
**RIPPER INJURY LAW, PLLC**
2161 NW Military Highway, Suite 100
San Antonio, Texas 78213
Telephone: (210) 802-1231
Facsimile: (210) 317-1231
**LEAD COUNSEL FOR PLAINTIFF**

and

Thomas "T.J." Mayes
State Bar No. 24078951
Email: tj@mayeslawtx.com
**MAYES LAW, PLLC**
2313 Lockhill Selma, Suite 152
San Antonio, Texas 78230
Telephone: (210) 595-0393
Facsimile: (726) 215-4817
**ASSOCIATE COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the above and foregoing instrument was served on all parties and attorneys of record, in accordance with the Federal Rules of Civil Procedure and in the manner described below, on April 29, 2026.

***VIA* CM/ECF**

T. Christopher Trent
Raphael C. Taylor
Nathan J. Stallworth
**TRENT & TAYLOR LLP**
919 Milam, Suite 1500
Houston, Texas 77002
Telephone: (713) 222-2323
Facsimile: (713) 222-2226
E-Service: ctrent@trent-law.com/ rtaylor@trent-law.com/ nstallworth@trent-law.com

**ATTORNEYS FOR DEFENDANTS**